**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Bearing Distributors, Inc.,** | ) | **CASE NO. 1:06 CV 831** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Rockwell Automation, Inc., et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Plaintiff Bearing Distributors, Inc.'s Motion for Temporary Restraining Order (Doc. 7). Also before the Court is Plaintiff Bearing Distributors, Inc.'s Motion for Preliminary Injunction, Request for Briefing Schedule and Hearing on Motion (Doc. 8). This case involves the termination of a distribution agreement. For the reasons that follow, the motions are DENIED.

**FACTS**

Plaintiff, Bearing Distributors, Inc., filed this lawsuit against defendants, Rockwell Automation, Inc. ("defendant") and Motion Industries, Inc. ("Motion") alleging wrongdoing in

1

association with a distribution agreement between plaintiff and defendant.

Plaintiff distributes bearings and other power transmission parts to various customers. Defendant manufactures bearings and component parts under the Dodge brand name. Defendant Motion, along with plaintiff and two other entities are the four largest distributors of these types of products. According to plaintiff, Motion has sales revenues greater than the combined revenues of the other three entities.

Plaintiff has served as a distributor for defendant since 1972. In 2003, the parties entered into the Rockwell Automation Distributor Agreement ("Agreement"). The Agreement expressly provides as follows,

> Under the terms of this Agreement...[plaintiff is] authorized to distribute [all Dodge products and power services] from the locations approved by [defendant] and listed on Schedule A, as such Schedule A may be amended from time to time.

Schedule A sets forth eight authorized locations throughout the United States. One location is situated in Wisconsin. It appears that Schedule A was amended at some point to include nine authorized locations. In addition, plaintiff's success depended on the amount of sales made within "Logical Trading Areas." The Commercial Requirements for Authorized Distributors, which is incorporated into the Agreement by reference, provides,

> In order to accomplish our Annual Business Plan, at all times [plaintiff] shall devote [its] best efforts toward achieving maximum sales of [defendant's products] within the trade area(s) geographically proximate to your authorized locations ("Logical Trading Area" of "LTA"). Sales of [defendant's products] within your LTA will be one of the most important factors considered in evaluating your ongoing performance as an Authorized Distributor. Conversely, sales over the internet to customers outside the LTA will not be considered in evaluating your performance. [Defendant] will not knowingly drop-ship Products to an unauthorized location or sell Products to an unauthorized distributor.

Both prior to and after the parties entered into the Agreement, plaintiff distributed defendant's products at unauthorized locations. According to plaintiff, defendant permitted this

2

practice. In the late 1990s, plaintiff established a headquarters in Cleveland as a distribution hub for the purpose of distributing products to the unauthorized locations. According to defendant, it believed that the Cleveland hub was designed as a convenience for replenishing inventory at authorized locations.

The Agreement is not for a specific duration. Rather, it "continues in effect until terminated for cause or upon thirty (30) days written notice by either party to the other."

According to plaintiff, defendant attempted to impose a minimum markup of 25% for products sold through the unauthorized locations. Plaintiff did not comply with this requirement and defendant subsequently terminated plaintiff's Cleveland distribution hub. On March 14, 2006, defendant informed plaintiff via letter that it was exercising its right to terminate the Agreement effective April 17, 2006. According to the letter, plaintiff was using the authorized distribution locations as "hubs" for distribution through unauthorized channels. Plaintiff traveled to defendant's South Carolina offices in an attempt to avoid termination. The parties were unable to resolve their differences and, thereafter, plaintiff filed this lawsuit.

The complaint sets forth five causes of action. Count one is a claim for *per se* violation of the Sherman Act, 15 U.S.C. § 1. Count two asserts a claim under the Wisconsin Fair Dealership Law. Count three is a claim for tortious interference. Counts four and five assert deceptive trade practices and unfair competition, respectively.

Plaintiff moves for a temporary restraining order and preliminary injunction. Upon receipt of the motion for temporary restraining order, this Court immediately contacted counsel for both plaintiff and defendant and the parties agreed to delay termination of the Agreement in order to allow defendant to file an opposition brief and permit the Court to rule on the motion.

Defendant opposes plaintiff's motion for temporary restraining order. Because defendant has been afforded an opportunity to respond, the standard applicable to the motion for temporary restraining order and preliminary injunction are the same. As such, the Court's analysis is equally applicable to both motions.

## **DISCUSSION**

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. In addition, in this case, plaintiff alleges a violation of the Wisconsin Fair Dealership Law ("WFDL"). That statute contains a separate provision providing for injunctive relief. Because defendant disputes the applicability of the WFDL, the Court will address this issue first.

1. Applicability of the WFDL

The WFDL applies only to a "dealer," which is defined by the statute to mean "a person who is a grantee of a dealership *situated in this state*." W.S.A. § 135.02(2)(emphasis added). A dealership, in turn, is defined as,

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is *a community of interest* in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

W.S.A. § 135.02(3)(a)(emphasis added).

Plaintiff claims that the WFDL applies in this case because the "community of interest" element is satisfied and, as such, the Agreement constitutes a dealership. In addition, plaintiff claims that the WFDL applies because it is the grantee of a dealership that is "situated in this state." According to defendant, the WFDL is inapplicable because the parties do not share a

4

community of interest. As such, the Agreement does not constitute a "dealership" as that term is defined by statute. Even assuming the dealership element is met, defendant claims that the WFDL is nonetheless inapplicable because the dealership is not situated in the state of Wisconsin.

Because the Court finds an analysis of the first issue, i.e., the existence of a "community interest" dispositive, the Court will address this argument first.

As a general matter, the purpose of the WFDL is to "protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." *Ziegler Co., Inc. v. Rexnord, Inc.,* 407 N.W.2d 873, 879-80 (Wis. 1987)(quoting W.S.A. § 135.025(2)(b)). As such, the phrase "community of interest" requires a showing of both a "continuing financial interest" as well as "interdependence," i.e., "a likeness or similarity of interest in the common business in which the dealer and grantor are engaged." *Id.*

In order to determine whether a community of interest exists, courts apply the multi-factored test enunciated by the Wisconsin Supreme Court in *Ziegler.* The following nine factors are relevant to the analysis:

- length of parties' relationship;

- the extent and nature of the obligations imposed on the parties in the contract;

- the percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services;

- the percentage of gross proceeds or profits the alleged dealer derives from the alleged grantor's products or services;

- the extent and nature of the alleged grantor's grant of territory to the alleged dealer;

5

- the extent and nature of the alleged dealer's use of the alleged grantor's proprietary marks (such as trademarks or logos);

- the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the alleged dealership;

- the personnel devoted to the alleged dealership;

- how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services;

- the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id*. at 879.

As the Seventh Circuit recently noted,

These factors may be distilled into two highly important questions in establishing a community of interest: (1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money the alleged dealer has sunk into the relationship. Neither of these is sufficient alone, but strong facts in one area can make up for weaker facts in another area. The ultimate question is whether the granter has the alleged dealer 'over a barrel'–that is whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison-shop with other grantors.

*Home Protective Services, Inc. v. ADT Security Services, Inc.*, 438 F.3d 716 (7th Cir. 2006).

Upon review of the evidence submitted, the Court finds that plaintiff fails to establish that it is likely to succeed in proving that there is a "community of interest" between the parties. As an initial matter, plaintiff wholly fails to provide evidence of the amount of revenue and/or profit it obtains from the sale of defendant's parts. While plaintiff does point out it purchased $4.35 million of Dodge products from defendant in 2005, plaintiff fails to provide any

corresponding financial information with regard to overall revenue or profit.[1]  In any event, assuming the overall revenue or profit is in line with the percentage of purchases, the amount of purchases plaintiff made from defendant accounted for only 2.4% of plaintiff's overall purchases.   As plaintiff itself admits, it represents "hundreds of suppliers of products" and, as defendant points outs, plaintiff sells hundreds of thousands of products.  The Court finds that such a low overall percentage weighs against a finding that the parties share a community of interest.  *See*, *Home Protective Services,* 438 F.3d 716 (95% of revenue insufficient to bring relationship within purview of WFDL absent other factors)*; Kornacki v. Norton Performance Plastics*, 956 F.2d 129 (7th Cir. 1992)(75-85% of revenue insufficient where no substantial capital investment specific to grantor demonstrated).

Although revenue and profit figures are central to determining whether the community of interest element is satisfied, this factor is not dispositive.  One of the other more significant factors courts must consider is the "sunk cost," i.e., the amount of financial investment in inventory, facilities, and good will made by the alleged dealer.  The Court finds this factor also weighs against plaintiff.  Although plaintiff states in conslusory fashion that it has "made a

---

[1]  Although plaintiff does provide sales and profit figures for Wisconsin, plaintiff provides only the purchases figure for overall sales.  The Court agrees with defendant that, while the Wisconsin figures may be relevant to the second argument, i.e., whether the dealership is situated in Wisconsin, overall revenue and profit figures are necessary to determine whether a dealership exists in the first instance.  The Court's conclusion is bolstered by the fact that the *Ziegler* court placed no geographical restriction on the analysis of revenue and/or profit. *Compare*, *Baldewein Company v. Tri-Clover, Inc.*, 606 N.W.2d 145 (Wis. 2000)(noting that for purposes of determining whether dealership is situated in Wisconsin, courts must analyze sales/profit derived within the state.)

7

significant investment...and has developed significant goodwill," plaintiff fails to provide the Court with any cost figures expended and fails to identify any capital improvements associated with the parties' relationship. Where revenue and profit figures are low, courts generally require a significant capital improvement before concluding that the relationship qualifies for protection under the WFDL. *See, Central Corp. v. Research Prods. Corp.*, 681 N.W.2d 178 (Wis. 2004)(question of fact as to "community of interest" existed where dealer made significant financial investment in construction of warehouse even though only 8% of gross revenue was derived from parties' relationship). Moreover, although plaintiff avers that it stocks over $800,000 of inventory, it is not clear whether this is a "significant amount," given that plaintiff fails to provide the Court with overall sales figures. Given that plaintiff purchased $180 million in products in 2005, the Court is not convinced that, relatively speaking, $800,000 in inventory is significant. Moreover, as defendant points out, the Agreement provides that defendant will repurchase any inventory from plaintiff.

Thus, as set forth by the Seventh Circuit, the two most significant factors, i.e., revenue and "sunk cost," weigh against the existence of a "community of interest." Based on the financial information provided by plaintiff, the Court finds that it is unlikely that plaintiff will be able to establish that defendant has plaintiff "over a barrel," thus threatening the company's economic health.

A review of the other factors buttresses this Court's conclusion. Plaintiff presents no evidence with regard to the use of defendant's trademarks or logos.[2] In addition, plaintiff fails to

---

[2] Plaintiff presents an unsupported assertion that it markets defendant's products through the use of the Dodge name and mark. Plaintiff, however, fails to present any evidence supporting its

8

present any evidence of the amount of advertising expenditure it incurred with regard to the marketing of defendant's products. With regard to the personnel factor, the Court finds that, as presented, this factor does not weigh in favor of plaintiff. Plaintiff avers that one full time employee is devoted entirely to the sales of defendant's product and, in addition, "several additional" personnel spend "significant" portions of their time devoted to defendant's products. In passing, plaintiff claims that it employs 21 people in Wisconsin. The only concrete evidence presented by plaintiff, however, indicates that one of these individuals works full-time in connection with Dodge products. This amounts to less than 5% of plaintiff's workforce in Wisconsin. The remainder of plaintiff's evidence speaks in generalizations and the Court will not guess at the number of other employees or the percentage of their time spent in connection with defendant's products. Plaintiff bears the burden of establishing that it is entitled to a temporary restraining order and, as such, the Court finds that the evidence presented with regard to personnel does not weigh in plaintiff's favor.

To be sure, some factors weigh in favor of the existence of a community of interest. For example, plaintiff and defendant enjoy a 34-year relationship.[3] In addition, plaintiff presents evidence that the two companies interact together with respect to certain clients and jointly prepare annual business plans addressing inventory levels, marketing and sales growth

---

contention. Moreover, even if plaintiff supported its contention, the Court finds that usage of a mark solely for purposes of selling the product does not transform a vendor/vendee relationship into a dealership entitled to protection under the WFDL.

[3] Plaintiff claims that it has served as a distributor of Dodge products since 1972. The Court presumes that plaintiff served as a distributor for defendant since this time.

9

objectives. Plaintiff also provides evidence that it offers supplementary services to its customers in the way of such things as technical support and warranty repairs.[4]

On the whole, however, the Court finds that plaintiff fails to establish a substantial likelihood of success on the merits. Specifically, the Court finds that plaintiff fails to meet its burden of demonstrating that the WFDL applies to the relationship between the parties. As set forth above, the two most important factors relevant to the analysis weigh in favor of defendant. In addition, several of remaining factors support this Court's conclusion. At this stage, plaintiff must demonstrate to the Court a *substantial* likelihood of success on the merits. The Court recognizes that whether the WFDL applies to a particular relationship is often a question of fact. Thus, the Court makes no conclusive determination as to whether the parties' relationship constitutes a dealership. Rather, the Court simply finds that plaintiff fails to satisfy its burden at this stage in the litigation.[5]

Having so concluded, plaintiff need not reach defendant's alternative argument, i.e., plaintiff fails to satisfy the "situated in this state" element necessary to qualify for protection

---

[4] The factor addressing the nature and extent of the grantor's grant of territory neither weighs in favor of nor against the existence of a dealership. Although the Court agrees with plaintiff that the precise nature of the territory is not clear because the Agreement does not provide an express limitation, it does not appear that defendant granted plaintiff an exclusive territory. Plaintiff itself admits that defendant permits plaintiff's competitors to sell products nationwide.

[5] Because plaintiff fails to establish a substantial likelihood of success on the merits with respect to the applicability of the WFDL, no presumption of irreparable harm will be applied. Rather, the Court will address irreparable harm in the context of Rule 65.

10

under the WFDL.

    2.    Rule 65

Having concluded that the injunctive relief provisions set forth in the WFDL cannot be applied at this stage, the Court now turns to plaintiff's request for a temporary restraining order and preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.

"When considering a motion for a preliminary injunction, the district court should consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). *See also Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999); *Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997); *J.L. Spoons, Inc. v. O'Connor*, 190 F.R.D. 433, 437-438 (N.D. Ohio 1999); *Crews v. Radio 1330, Inc.*, 435 F.Supp. 1002, 1005 (N.D. Ohio 1977).

A district court must make specific findings concerning each of these factors, unless analysis of fewer facts is dispositive of the issue. *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). However, not all the factors need be fully established for a temporary restraining order or injunction to be proper. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). None is a prerequisite to relief; rather, they should be balanced. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). While none of the factors are given controlling weight, a preliminary injunction should not be issued where there is no likelihood of success on the merits. *Michigan State AFL-CIO*, 103 F.3d

at 1249. Where the court concludes that there is no likelihood of success on the merits, it need not address the other three factors. *Id*.

Upon review, the Court finds that plaintiff is not entitled to either a temporary restraining order or a preliminary injunction because plaintiff fails to establish that it will suffer irreparable harm as a result of the alleged price-fixing scheme.[6] According to plaintiff, defendant imposed upon it the requirement that plaintiff sell defendant's products at a 25% markup when selling at unauthorized locations. Plaintiff claims that defendant and Motion are engaging in a price-fixing scheme designed to prevent plaintiff from competing in the market.

With regard to irreparable harm, plaintiff claims that, in the event defendant terminates the Agreement, it will "be unable to supply [its] customers with Dodge products...or it will be forced to obtain products on the secondary market at significantly higher prices." If plaintiff's customers terminate their contracts, plaintiff will lose "millions of dollars in sales" of both Dodge and other products. Plaintiff also claims that it will be unable to effectively compete for future business and will lose customer goodwill. Plaintiff claims that termination will result in the perception that plaintiff is a lower-tier competitor and will prevent plaintiff from obtaining large and sophisticated customers.

Upon review, the Court finds that plaintiff fails to establish that it will suffer irreparable harm as a result of defendants' alleged misconduct. It is well settled that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973

---

[6] This Court has already concluded that plaintiff fails to establish a substantial likelihood of success on the merits with regard to its WFDL claim. Accordingly, the Court addresses irreparable harm in the context of plaintiff's remaining claims, i.e., its antitrust and common law claims.

F.2d 507, 511 (6th Cir. 1992). The Court finds that money damages will fully compensate plaintiff for its alleged injuries. With regard to the availability of replacement parts, the only evidence submitted by plaintiff indicates that it will either be unable to supply its customers *or* will be forced to buy products on the secondary market.[7] In light of plaintiff's admission that purchasing Dodge products, albeit at a higher cost, is possible, the Court finds that any harm plaintiff may suffer will be fully compensable with money damages at the end of this lawsuit. Also, the Court finds that the possibility of purchasing Dodge products elsewhere undercuts plaintiff's contention that it will suffer a loss of goodwill or will be unable to compete for future business. To the extent plaintiff is confident in the success of its claims in this lawsuit, plaintiff always has the option of selling the parts at the current rate and recovering any losses from defendants at the end of this lawsuit. In all, the Court finds that plaintiff fails to establish that money damages will not adequately compensate plaintiff for any alleged harm that will occur prior to the completion of this lawsuit.

Having concluded that plaintiff will not suffer irreparable harm absent the issuance of preliminary relief, the Court finds that the issuance of preliminary relief would be improper.

---

[7] In its reply brief, plaintiff states that certain Dodge parts are proprietary. To the extent plaintiff is claiming that it will be unable to supply its customers with these parts, plaintiff fails to provide any evidence supporting this assertion. In addition, even in the reply brief, plaintiff states that "there is no assurance that plaintiff will be able to obtain such products and, even if it can get them, that it can price them competitively." Again, plaintiff does not claim that it will be unable to provide these parts only that it may not be able to make a profit. To the extent plaintiff incurs losses on the sales of the parts obtained on the secondary market, plaintiff will be able to recover these costs if it is successful in this lawsuit.

**CONCLUSION**

For the foregoing reasons, Plaintiff Bearing Distributors, Inc.'s Motion for Temporary Restraining and Motion for Preliminary Injunction, Request for Briefing Schedule and Hearing on Motion are DENIED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:  April 28, 2006