**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Bearing Distributors, Inc.** | ) | **CASE NO. 06-cv-831** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Rockwell Automation, Inc.,** | ) | |
| **Motion Industries, Inc., and** | ) | |
| **Reliance Electric Co.** | ) | **Memorandum Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

Presently before the Court is the Motion of Defendant Motion Industries, Inc. ("Motion") to Dismiss Plaintiff's Amended Complaint (Doc. 33). Plaintiff Bearing Distributors, Inc. ("BDI") alleges that Motion and codefendants Rockwell Automation, Inc. ("Rockwell") and Reliance Electric Company ("Reliance") have violated federal antitrust and state laws by conspiring to eliminate Bearing as a distributor for certain products produced by Rockwell. For the following reasons, the Motion to Dismiss is DENIED.

**FACTS**

The following allegations of BDI's Complaint are assumed to be true for purposes of this Motion to Dismiss. A major portion of BDI's business involves the sale of power transmission parts to the industrial maintenance, repair and operation replacement ("MRO") and original equipment manufacturer ("OEM") market segments, which BDI has defined as the "Products." (¶ 11). Rockwell manufactures and sells Products under the Dodge brand name. (¶ 12). Motion, along with BDI, is one of the four largest distributors of Products in the United States. (¶ 13). There are also a number of regional and local distributors. *Id*. The four largest and most of the smaller distributors distribute Dodge-brand Products as well as other Products. *Id*.

BDI has distributed Dodge Products for over thirty years and now maintains more than 130 branches, several of which are or were authorized Dodge distributors. (¶ 15). BDI's relationship with Rockwell did not prohibit it from selling outside of its logical trading areas. (¶¶ 16-18). BDI had engaged in unique business practices such as standardization which increased its business while diverting customers from Rockwell and Motion. (¶¶ 21-22).

BDI had for many years provided Dodge products to customers through unauthorized branches, which Rockwell allowed through BDI's Cleveland "hub." (¶¶ 23-24). This allowed BDI to compete with the other large competitors which operate nationwide. (¶ 25). Prior to a 2003 distribution agreement, Rockwell sought to impose a 25% minimum markup on BDI's sales from unauthorized locations. (¶ 26). This was intended to fix and maintain prices of Dodge products, to prevent BDI from competing with Motion and other distributors, and to prevent BDI from implementing its cost saving and service programs to customers. *Id*. BDI refused to follow the 25% requirement and on April 13, 2005, Rockwell terminated BDI's

Cleveland distribution hub. (¶¶ 27-28).

BDI nonetheless continued to compete with Motion from other locations and to price items below the 25% minimum markup. (¶ 29). Motion and Rockwell then conspired to eliminate BDI as a competitor in the market for the Products and to obtain BDI's customers for Motion. (¶ 30). In a March 14, 2006 letter, Rockwell announced that it was terminating BDI for its sale of Dodge products through unauthorized locations. (¶ 31). The termination was actually due to BDI's failure to adhere to the minimum resale price scheme that was established by Rockwell and in order to eliminate BDI as a competitor to Motion. *Id*. Rockwell permitted other distributors to sell Dodge products through unauthorized locations. (¶ 33). Motion was made aware of BDI's termination and worked with Rockwell to inform BDI customers of the termination and solicit those customers. (¶ 35).

BDI's business has been harmed beyond its inability to sell Dodge products because its customers want one-stop shopping. (¶ 36-37). The termination has also been harmful to competition generally. Customers are deprived of one of the four large distributors as well as the lower prices that BDI charges to its customers, which raises prices in general. (¶ 38). The termination will also result in the market being more concentrated with only three large distributors. (¶ 39).

At issue here are BDI's claims against Motion. Count II alleges that Rockwell and Motion possess market power in the distribution of the Products, the geographic market for which is the entire United States. (¶¶ 43, 51). The defendants conspired to police, monitor, punish and constrain independent and economically beneficial conduct in the sale of Dodge-brand products and intended to eliminate BDI as a distributor of the Products, such that

customers for the Products are and will continue to be deprived of BDI's unique services and cost-saving processes and will pay artificially high prices.  (¶ 52).  These acts constitute both *per se* and rule of reason violations of Section 1 of the Sherman Act.  (¶¶ 54-55).  BDI has been injured in its business and property, and seeks damages and an injunction.  (¶¶ 56-59).

In addition to the activities described above, Motion has falsely informed BDI customers and prospective customers that BDI is substituting parts manufactured in China for other products specified by customers, without the customers' knowledge or consent.  (¶ 71).  Count IV for tortious interference, Count V for deceptive trade practices and Count VI for unfair competition are based on this false information as well as Motion's pretermination contact with BDI's customers.

**STANDARD OF REVIEW**

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff.  *Lawrence v. Chancery Court of Tenn.,* 188 F.3d 687, 691 (6th Cir. 1999).  A claim is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hammond v. Baldwin,* 866 F.2d 172, 175 (6th Cir. 1989).  Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley*, 355 U.S. at 47.  However, the complaint must set forth "more than the bare assertion of legal conclusions."  *Allard v. Weitzman* (*In Re DeLorean Motor Co.*)*,* 991 F.2d 1236, 1240 (6th Cir. 1993).

"In practice, a . . . complaint must contain either direct or inferential allegations

respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)). Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489-490 (6th Cir. 1990).

Courts have given contradictory guidance regarding the rigor that courts should employ when examining an antitrust complaint. On the one hand, the burdensome nature of antitrust proceedings requires that "[t]he essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988); *Found. for Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001). On the other hand, BDI notes that in the summary judgment context Sixth Circuit "courts are generally reluctant to use summary judgment dispositions in antitrust actions due to the critical 'role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference.'" *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir. 2006) (quoting *Smith v. N. Mich. Hosp., Inc.*, 703 F.2d 942, 947 (6th Cir. 1983)). This reasoning would seem to apply equally at the motion to dismiss stage.

Such broad statements are best reconciled by noting that certain elements of an antitrust claim are better suited to summary proceedings. In some instances, only the outright failure to allege an element justifies dismissal. For example, courts are not apt to dispense with a claim for failure to recount the details of a conspiracy, since these are most likely to be concealed from the

plaintiff.  *See, e.g., Tacker v. Wilson*, 830 F. Supp. 422, 427 (W.D. Tenn. 1993).  However, courts have consistently been willing to perform a more searching inquiry to dismiss claims where a plaintiff failed to allege an "antitrust injury" or "relevant market."

### **DISCUSSION**

Antitrust Claim

Section 1 of the Sherman Act states that "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal."  15 U.S.C. § 1.  "Any person . . . injured in his business or property" may seek damages for a Sherman Act violation pursuant to Section 4 of the Clayton Act.  15 U.S.C. § 15(a).  "Any person . . . threatened [with] loss or damage" by a Sherman Act violation can seek an injunction under Section 16 of the Clayton Act.  15 U.S.C. § 26.  The Sixth Circuit has summarized a Section 1 claim as follows:

> [T]o establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Expert Masonry*, 440 F.3d at 342 (quoting *Crane & Shovel*, 854 F.2d at 805).

Section 1 claims require some form of contract, combination or conspiracy.  In other words, one party's unilateral action cannot form the basis of a Section 1 action.  *U.S. v. Colgate & Co.*, 250 U.S. 300, 307 (1911).  Depending on the relationship between the conspiring parties, competitive restraints are classified as either horizontal or vertical.  *Crane & Shovel*, 854 F.2d at 805.  Horizontal restraints take place between competitors at the same level of a particular market while vertical restraints involve parties at different levels on the chain of supply.  *Ezzo's*

*Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 986 (6th Cir. 2001).  Because horizontal restraints involve direct competitors, they are generally considered more dangerous to competition.  *Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991).  Vertical restraints, on the other hand, often serve to enhance competition.  For example, limits on *intra*brand competition such as exclusive dealing or territorial restrictions may actually serve to enhance *inter*brand competition.  *Id.* at 1027-28.

Courts split competitive restraints into those that are *per se* illegal and those that are analyzed under the rule of reason.  *Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S 679, 692 (1978).  "If a court determines that a practice is illegal *per se*, further examination of the practice's impact on the market or the procompetitive justifications for the practice is unnecessary for finding a violation of antitrust law."  *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) (citing *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)).  In contrast, rule of reason analysis requires the plaintiff to prove that the challenged agreement suppresses rather than promotes competition.  *Prof'l Eng'rs*, 435 U.S. at 691.  To make out a *prima facie* case of a rule of reason violation, the plaintiff must demonstrate:

> (1) that the defendants contracted, combined, or conspired;
>
> (2) that the scheme produced anticompetitive effects;
>
> (3) that the restraint affected relevant product and geographic markets;
>
> (4) that the object of the scheme and the conduct resulting from it was illegal; and
>
> (5) that the scheme was a proximate cause of the plaintiff's antitrust injury.

*Expert Masonry*, 440 F.3d at 342 (citing *Care Heating*, 427 F.3d at 1014).

Motion challenges five aspects of BDI's claim.  First, Motion argues that BDI has not stated a *per se* claim.  Second, Motion argues that BDI has not alleged a contract, combination or conspiracy.  Third, Motion argues that BDI has not alleged an antitrust injury.  Fourth, Motion believes that BDI has failed to identify a relevant product and geographic market.  Fifth, Motion generally claims that BDI's Complaint is improperly pleaded in a conclusory and legally deficient manner.  Each of these arguments will be addressed in turn.

*1. Per Se Violation*

Motion is a distributor of Rockwell's Dodge products.  Accordingly, any agreement between the two to restrain competition would be a vertical restraint.  *Bailey's*, 948 F.2d at 1027 (explaining that vertical restraints are combinations at different levels of the market structure, such as manufacturers and distributors).  Because vertical restraints are less likely to have a negative impact on competition, very few constitute *per se* violations of Section 1.  *Expert Masonry*, 440 F.3d at 344.  Indeed, the only vertical restraint that appears to receive *per se* treatment in the modern era is a minimum price fixing arrangement.  *Id*. (citing *State Oil Co. v. Khan & Assocs.*, *Inc.*, 522 U.S. 3, 17 (1997)); *Ezzo's Invs.*, 243 F.3d at 987; *see also Dr. Miles Medical Co . v. John D. Park & Sons Co.,* 220 U.S. 373 (1911) (establishing *per se* treatment for vertical minimum price fixing arrangements).

BDI asserts that it has pleaded a vertical minimum price-fixing agreement.  BDI alleges that its termination allows Motion to maintain supra-competitive prices and punishes BDI for engaging in cost-saving standardization programs.  The result is higher costs for customers.  Thus, BDI concludes that "[e]ven absent an explicit price-fixing agreement between Motion and Rockwell, it was readily apparent that there is a plainly anti-competitive agreement between

8

them, part of the goal of which was to maintain supra-competitive pricing for mechanical power transmission products. . . . The existence of a price dimension to defendants' conspiracy can, at the least, be inferred from the Amended Complaint, and BDI is entitled to pursue discovery in order to uncover the details of the conspiracy between Rockwell and Motion."

Motion directs the Court to the Supreme Court's decision in *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988). The *Sharp* Court addressed in detail the type of agreement necessary to sustain a *per se* claim of vertical price fixing. *Id*. at 719. Vertical nonprice agreements may actually promote *inter*brand competition, which is the main goal of antitrust law. *Id*. at 724. Moreover, "all vertical restraints . . . have the potential to allow dealers to increase 'prices' and can be characterized as intended to achieve just that." *Id*. at 729. Thus, the Court chose to enforce a bright-line rule for *per se* treatment of vertical restraints: "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id*. at 735-36. A mere "agreement between a manufacturer and a dealer to terminate another dealer who happens to have charged lower prices" does not justify *per se* treatment without an agreement on price between the manufacturer and the conspiring dealer. *Id*. at 727.

The *Sharp* holding is directly on point. Although BDI has alleged a price motivation behind its termination, it has not alleged any agreement between Motion and Rockwell to fix Motion's prices. Absent an allegation of such an agreement BDI has not stated a claim for a *per se* violation under the Sherman Act. However, this does not justify dismissal of BDI's Count II unless it has also failed to state a claim under a rule of reason analysis. The *per se* rule is merely an analytical tool that allows a Court to find a Sherman Act violation without performing an in depth analysis of a restraint's competitive impact. Only a limited class of restraints "have such

predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil*, 522 U.S. at 10. The rest must still be analyzed under the rule of reason.

### 2. *Unilateral Conduct by Rockwell*

Motion also argues that BDI's allegations fail to state a claim for an antitrust violation because the conduct alleged is merely unilateral action by Rockwell.[1] It is by now beyond dispute that a manufacturer's unilateral action in terminating a distributor cannot form the basis of an antitrust claim. *Colgate*, 250 U.S. at 307. Moreover, a manufacturer's response to one distributor's complaints about another distributor does not support a claim standing alone. *Monsanto Co. v. Spray-Rite Servs. Corp.*, 465 U.S. 752, 764 (1984); *Bailey's*, 948 F.2d at 1028. Rather, there must be evidence of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)). Stated another way, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.*

Although the Court agrees that BDI fails to state a minimum price-fixing agreement between Rockwell and Motion, there are numerous allegations that Rockwell and Motion conspired to eliminate BDI as a distributor. *See, e.g.,* ¶30 ("Motion and Rockwell conspired to eliminate BDI as a competitor in the market for the Products and to obtain BDI's customers for

---

[1] Motion made this argument in the *per se* section of its brief. Nonetheless, the requirement of a contract, combination or conspiracy applies equally to a rule of reason claim. *Expert Masonry*, 440 F.3d at 342

10

Motion."). Although this may not be sufficient to state a *per se* claim, it does provide adequate support for the first element of a rule of reason claim. *See Expert Masonry*, 440 F.3d at 342.

### 3. Antitrust Injury

Motion next contends that BDI has failed to allege an antitrust injury. First announced in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, this rule requires "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." 429 U.S. 477, 489 (1977); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003). This threshold inquiry is routinely applied at the motion to dismiss stage. *Care Heating*, 427 F.3d at 1015; *In re Cardizem*, 332 F.3d at 899. The antitrust injury requirement enforces the principle that the antitrust laws protect "*competition,* not *competitors*." *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Here, BDI has alleged that customers in the relevant product and geographic market will pay higher prices and receive fewer services as a result of its exclusion from the market and the resulting market concentration. BDI itself will effectively be precluded from obtaining some significant contract relationships and will have difficulty acquiring regional and local distributors. All of these alleged injuries arise from the same acts of conspiring to eliminate BDI as a Dodge distributor. The parties dispute whether these allegations state a proper antitrust injury.

The *Brunswick* defendant was a manufacturer of bowling equipment. 429 U.S. at 479. As a result of a slump in the bowling industry, the defendant decided to purchase and operate bowling centers rather than repossess equipment that it was having difficulty reselling. *Id*. at 479-80. The plaintiffs were competing bowling centers who would rather see their competitors

11

shuttered than operated by the defendant. *Id*. at 484. The Supreme Court concluded that the plaintiffs could not bring an antitrust claim. Even if the purchases violated antitrust laws, the plaintiffs' loss "did not occur 'by reason of' that which made the acquisitions unlawful." *Id*. at 488. Rather, their injuries were caused by an *increase* in competition that precluded them from receiving windfall profits. *Id*.

Other Supreme Court cases to address antitrust injury for competitors have similarly focused on the link between the alleged violation and the competitive impact of the restraint on the competitor. In *Atlantic Richfield Co. v. USA Petroleum Co.*, the Supreme Court found antitrust injury lacking where a "competitor will be injured and hence motivated to sue only when a vertical, maximum-price-fixing arrangement has a procompetitive impact on the market." 495 U.S. 328, 345 (1990). In *Cargill, Inc. v. Monfort of Colorado, Inc.*, the Supreme Court considered a merger that would allow the merged companies to realize efficiencies that would result in lower prices, thus lowering the plaintiff's profit margin. 479 U.S. 104, 114-15 (1986). The Supreme Court found antitrust injury lacking because the plaintiff's injury stemmed from vigorous price competition, something the antitrust laws are supposed to protect. *Id*. at 116.

In sum, competitors may only bring claims where the harm to the marketplace and the harm to the competitor are connected; the interests of the competitor and consumers must be congruent rather than divergent. *NicSand, Inc. v. 3M Co.*, No. 05-3431, 2006 U.S. App. LEXIS 20321, *31 (6th Cir. Aug. 8, 2006) (citing *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986)). In the context of a competitor that claims it has been improperly excluded from competing in the market, the Sixth Circuit has stated the following:

> Although antitrust actions may, of course, be initiated by marketplace
> competitors, those actors in the economic forum must at least allege that

>exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative.²

*Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *see also NicSand*, 2006 U.S. App. LEXIS 20321, *46-47 (finding that the plaintiff had alleged that the defendant's conduct brought about the elimination of superior product). BDI alleges that the scheme to eliminate it from the market deprived it of the ability to provide superior service and lower prices and that customers and competition in the relevant market are hurt by the removal of these superior services and low prices. Accordingly, its claim meets the standard for pleading antitrust injury.

Motion next notes that Rockwell had the right to end its relationship with BDI. Motion thus argues that BDI's injury "flows from the fact of termination, and not from any properly alleged antitrust violation." Motion's cited case, *Watkins & Son Pet Supplies v. The Iams Co.*, while discussing antitrust injury in *dicta*, held that a distributor's injury flows from the termination and thus an "antitrust violation was not a necessary predicate of the injury." 254 F.3d 607, 616 (6th Cir. 2001). This "necessary predicate" concept comes from *Valley Prod. Co. v. Landmark*, where the Sixth Circuit broadly stated that antitrust plaintiffs must allege "that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation." 128 F.3d 398, 404 (quoting *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994)). Antitrust defendants have interpreted this language as requiring "a plaintiff [to] allege that the only way the defendant could have caused

---

² Thus, a distributor does not state an antitrust injury when it has merely been replaced by another distributor. *See Expert Masonry*, 440 F.3d at 346-47. Here, BDI has not alleged that it has been replaced by a new distributor but rather that its services have been removed from the market altogether to the detriment of consumers.

13

the plaintiff's injury was by engaging in the antitrust violation." *In re Cardizem*, 332 F.3d at 912.

The Sixth Circuit has since recognized the absurdity of this interpretation of the necessary predicate test: "It is no exaggeration to say that this formulation of the antitrust injury doctrine would preclude all private antitrust suits challenging contracts to engage in otherwise lawful conduct that violate the antitrust statutes precisely because they are contracts." *NicSand*, 2006 U.S. App. LEXIS 20321, *40. As the *In re Cardizem* Court explained:

> [D]efendants' position, if adopted, risks undermining a basic premise of antitrust law that, as the district court observed, in many instances, an otherwise legal action—e.g. setting a price—becomes illegal if it is pursuant to an agreement with a competitor. Under the defendants' view, such an action would never cause antitrust injury because a defendant could have unilaterally and legally set the same price.

*In re Cardizem,* 332 F.3d at 915 n.9.

*Valley Products* and *Hodges* are limited to instances in which the action taken by defendants was lawful and was the "actual, indisputable, and sole cause of the plaintiff's injury." *Id*. at 914. Here, it is not "apparent from the face of the complaint that actual and unequivocally legal action by [Rockwell] would have caused [BDI's] injury, even if there had been no antitrust violation." *Id*. Rather, the Complaint alleges that "BDI would not have been terminated by Rockwell in the absence of BDI's failure to adhere to the minimum resale price scheme and/or the conspiracy between Rockwell and Motion."

Accordingly, the Court concludes that BDI has stated an antitrust injury.

*4. Relevant Market*

To succeed on its rule of reason claim BDI must properly define the relevant product and geographic markets. *Brown Shoe*, 370 U.S. at 324. "The outer boundaries of a product market

14

are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[3] *Id*. The geographic market is simply the area of the country in which there is competition. *Id*. Courts have been willing to grant a motion to dismiss where a complaint does not adequately state a relevant market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 441 (3d Cir. 1997) (finding that plaintiffs failed to state a proper relevant market); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (granting a motion to dismiss where the complaint failed to "define a relevant market in any meaningful way"); *Smith v. Multi-Flow Dispensers of Ohio, Inc.*, No. 96-4185, 1999 U.S. App. LEXIS 9845, *13-14 (6th Cir. May 14, 1999) (finding that a narrow market definition failed as a matter of law); *Jes Props., Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (holding that a proposed relevant market "clearly does not encompass all interchangeable substitute products").

Although Motion attempts to cast BDI's market definition as confused, the Court finds otherwise. The Complaint defines the "Products" as "power transmission parts [for] the industrial maintenance, repair and operation replacement ("MRO") and original equipment manufacturer ("MRO") market segments[.]" (¶10). It then states that "Power transmission products intended for the MRO and OEM market segments are a relevant product market for purposes of antitrust analysis" and that the "United States constitutes the relevant geographic market for antitrust analysis[.]" (¶¶ 42-43). In short, BDI's relevant market is clearly defined.

---

[3] "[W]ell-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 324 (citing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593-595 (1957)). BDI has provided a broad product market definition so this rule is not relevant to the Court's analysis.

Whether that market definition is adequate is a different issue. Motion cites to cases in which courts found a product market lacking because it failed to account for reasonably interchangeable products. It then argues that "BDI has not sufficiently defined in its Amended Complaint the products that compete with one another . . . [and] fails to allege facts regarding any substitute products, or allege other pertinent facts regarding cross-elasticity of demand." (Doc. 34 p. 13). Motion fails to grasp the relevance of the cited caselaw. Those market definitions failed because they were so narrowly drawn that they facially excluded substitute products. *See Queen City Pizza,* 124 F.3d at 437 (rejecting a product market of "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores"); *JES Properties*, 253 F. Supp. 2d at 1282 (rejecting "A" rated hunter and jumper recognized horse shows without any explanation as to how they differ from the larger market for horse competitions); *Multi-Flow*, 1999 U.S. App. LEXIS 8945, *10 (rejecting a market of "supplying beverage dispensing equipment and related products and services to taverns and locally owned restaurants in metropolitan Cleveland"). They did not engraft a requirement to specifically plead all substitute products. Here, BDI sold Dodge brand products manufactured by Rockwell. Its product market definition is broadly inclusive of not only Dodge products but all power transmission products intended for the MRO and OEM market segments. This product market definition is sufficient to survive a motion to dismiss.

Motion also takes issue with BDI's geographic market of the entire United States. It claims that "nowhere in the Amended Complaint does BDI actually state that distributors compete nationwide." (Doc. 34 p. 14). However, BDI discusses the "four largest distributors" as distinct from the "numerous regional and local distributors" and those distributors involved in "directs sales . . . in particular markets." The mere existence of regional and local distributors

16

does not mean that the four largest distributors and relevant market are not national in scope. Indeed, the Complaint states that BDI's larger competitors "were explicitly authorized by Rockwell to distribute Dodge products nationwide." (¶ 25).  Thus, BDI's geographic market is also sufficient to survive a motion to dismiss.

*5. Conclusion - Sherman Act Claim (Count II)*

Finally, Motion argues that BDI's allegations are generally pleaded in a conclusory and legally deficient manner.  A plaintiff cannot escape a motion to dismiss by simply pleading unsupported legal conclusions.  *Columbia Natural Resources v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).  Rather, a plaintiff must plead allegations that either directly or by inference support each element under the law.  *Id*.  Motion's first argument takes issue of the fact that a number of BDI's allegations are stated on "information and belief."  Motion appears to equate these to non-allegations that provide no factual support.  Motion has not cited any authority for the proposition that a Court must ignore allegations stated on information and belief, and in light of the facts alleged BDI has stated a claim.  Motion's second argument that BDI's allegations "are far too conclusory to establish antitrust injury" is the same argument the Court discussed and rejected *supra*.

Accordingly, BDI's antitrust claim against Motion will not be dismissed.

State Law Claims

*1. Tortious Interference with a Business Relationship (Count IV).*

A plaintiff must prove the following to support a claim for tortious interference with a business relationship: 1) the existence of a contract; 2) the wrongdoer's knowledge of the contract; 3) the wrongdoer's intentional procurement of the contract's breach; 4) a lack of justification; and 5) damages.  *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, par.

17

2 of the syllabus (1995).  Motion argues that BDI has failed "to plead what wrongful action Motion took to interfere with BDI's business relationships with its customers."  (Doc. 34 p. 18). BDI responds by pointing to paragraph 71 of its Amended Complaint, which states that "Motion has falsely informed BDI customers that BDI is substituting parts manufactured in China for other products specified by customers, without the customers knowledge or consent."  ¶ 71.  This certainly appears to be an allegation of wrongful action and Motion did not claim otherwise in its Reply brief.

Motion also argues that Count IV is deficient for failing to specify the actual business relationships or customers that Motion allegedly interfered with.  BDI responds by citing a number of cases which explain that such a specific identification is not necessary at the pleading stage.  *See, e.g., Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 891-92 (N.D. Ohio 2003); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1279 (10th Cir. 2000).  Motion again declined to reply with any argument that these authorities do not apply here.

Accordingly, the Court concludes that Count IV will not be dismissed.

*2.  Deceptive Trade Practices (Count V)*

BDI alleges that Motion's conduct constitutes a deceptive trade practice under Ohio R.C. § 4165.02(A)(10).  That section provides that one who "[d]isparages the goods, services, or business of another by false representation of fact" engages in an unfair trade practice.  *Id*. Motion claims that BDI has not offered any false representations.[4]  However, BDI correctly

---

[4] Motion first argued that Ohio courts "apply essentially the same analysis" to deceptive trade practice claims as an unfair competition claim under federal statutes.  Motion continued that the deceptive trade practice claim failed because the Section 1 claim failed.  Because the Court finds that BDI has stated a Section 1 claim, this argument is rejected.

notes that paragraph 83 of its Amended Complaint repeats the allegation regarding false statements about substitute parts manufactured in China.[5] Accordingly, Count V will not be dismissed.

### 3. *Unfair Competition (Count VI)*

Motion's only argument with respect to the unfair competition claim is that it is equivalent to a deceptive trade practices claim and must be dismissed for the same reasons. Having rejected Motion's arguments with respect to the deceptive trade practices claim, the Court will also decline to dismiss the unfair competition claim.

### **CONCLUSION**

For the foregoing reasons, the Motion to Dismiss is DENIED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/20/06

---

[5] Motion also argues that BDI has pleaded paragraph 83 as a statement of opinion which would not be actionable. *See Northeast Ohio College of Massotherapy v. Burek*, 14 Ohio App. 3d 196 (2001). This is based on the fact that BDI's allegation is on "information and belief" and is somewhat puzzling. Whether items were manufactured in China is not the sort of statement that lends itself to judgment or opinion.

19